Janeral D. **FAIN**, Appellant,

v.

**ST. PAUL INSURANCE COMPANY,**
Appellee.

No. 9127.

Court of Civil Appeals of Texas,
Amarillo.

July 9, 1980.

Aldridge, Harding, Aycock & Actkinson, Johnny Actkinson, Farwell, for appellant.

Key, Carr, Evans & Fouts, Donald M. Hunt, Lubbock, for appellee.

DODSON, Justice.

In this worker's compensation case, the worker claims that he suffered a heart injury as the result of an accident that occurred in the course of his employment. Janeral D. Fain, the worker, appeals from a take-nothing judgment rendered in favor of St. Paul Insurance Company, the compensation carrier. The case was tried to a jury, and in response to the special issues, the jury failed to find that Mr. Fain suffered a heart injury on or about 6 December 1977, the day in question. On appeal, Mr. Fain maintains that he conclusively established a heart injury on that date and that the jury's failure to find such injury was against the great weight and preponderance of the evidence.[1] We affirm.

As a fact vital to his recovery, Mr. Fain has the burden of establishing that he sustained a heart injury on the day in question. In response to special issue number one, the jury failed to so find. In this connection, the jury's failure to find the fact vital to Mr. Fain's recovery need not be supported by affirmative evidence. *Traylor v. Goulding*, 497 S.W.2d 944, 945 (Tex.1973). Nevertheless, his contentions require us to review all of the evidence to determine if Mr. Fain conclusively established that he sustained a heart injury on the day in question, and alternatively to determine if the jury's failure to find the vital fact is so against the great weight and preponder-

ance of the evidence as to be manifestly wrong or unjust. *Traylor v. Goulding, supra* at 945; *Parrish v. Hunt*, 160 Tex. 378, 331 S.W.2d 304, 305–06 (1960); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951).

The evidence shows that on the day in question, Mr. Fain, a road construction equipment operator, was employed by Boswell & Crafton Construction Company, a road construction contractor. The company was constructing a highway to connect U.S. Highway 84 with U.S. Highway 60, at a location approximately three miles east of Muleshoe in Bailey County, Texas.

On 6 December 1977, Mr. Fain reported to work at 7:00 A.M. He described the weather as "real good" but cold. The temperature was 10° to 12°. On that day, the company was to shoot hot asphalt on the road surface and cover the asphalt with gravel. Normally, the asphalt-gravel work is not undertaken when the temperature is below 30° to 40°. Thus, the road superintendent waited until about 11:30 A.M. to commence this work. In the time interval, Mr. Fain and other employees sat in their cars, visited, drank coffee and waited for it to get warmer.

At about 11:30 A.M. when work was begun, Mr. Fain was assigned the duty of driving a gravel spreader. As driver of the gravel spreader, his duties were to start and stop the vehicle, drive the vehicle in a straight line, and operate a lever to start and stop the flow of gravel. The gravel spreader was equipped with power steering, but the lever was manually operated and required some physical effort. The amount of effort required to operate the lever was described by various witnesses at the trial. Mr. Fain said it was like moving a farm cultivation lever. Boswell & Crafton's road superintendent said it was similar to operating the emergency brake on a vehicle. Another witness compared the effort with changing gears while driving a truck.

1. After considering Mr. Fain's points of error, contentions, arguments, authorities and prayer for relief, we treat his evidentiary challenges as "a matter of law" and "great weight" conten-

tions. *See O'Neil v. Mack Trucks, Inc.*, 542 S.W.2d 112, 113 (Tex.1976); *Fambrough v. Wagley*, 140 Tex. 577, 169 S.W.2d 478, 482 (1943).

The gravel spreader was not equipped with a cab for the drivers. Mr. Fain wore levis, a shirt, a heavy coat and gloves. After driving the spreader for approximately fifteen minutes, his chest began hurting. He said the pain went into his jaws, radiated down his arms and that he felt sick. Before the pain began in his chest, he ascended to the driver's seat of the spreader, engaged the gravel flow lever, moved the equipment forward in a straight line, disengaged the gravel flow lever, stopped the vehicle, and started backing the vehicle over a gravel area. When the pain began, he stopped the vehicle, got off and sat down in a truck driven by a co-worker. He told the co-worker that he felt bad. The co-worker drove him to his car and picked up Mr. Fain's son from another location on the job site.

The son drove Mr. Fain to his home in Clovis, New Mexico. The drive took about forty-five minutes. When Mr. Fain arrived at his home, he was feeling better. Nevertheless, Mrs. Fain called their family doctor and took Mr. Fain to the doctor's officer. Dr. Thomas, the family doctor, ran a blood test, checked his blood pressure and ran an electrocardiogram. The doctor told him to rest at home for two or three days and take nitroglycerine tablets if the pain reoccurred. Following the doctor's advice, Mr. Fain returned home for rest. His activities consisted of going to the table for meals, drinking, smoking cigarettes, sitting or lying on the couch or the floor, and watching T.V. During this period he occasionally took a nitroglycerine tablet.

At about 3:00 P.M. on 8 December 1979, Mr. and Mrs. Fain were in their living room visiting with a friend, when as described by Mrs. Fain, "all of a sudden, he had this thing and he had to go to the Doctor." In response to questions, Mrs. Fain described the events as follows:

Q. What was he doing at the time he had his heart attack that day?

A. I had a friend visiting. She and I and J. D. were sitting in the livingroom, just talking.

Q. Was he doing anything at all strenuous?

A. Nothing at all.

Q. What happened to him on this occasion when he had his heart attack?

A. Well, he, he just grabbed his chest and went to screaming. I don't remember what he said, but I called Dr. Thomas right then. I told him that he was—he couldn't breathe and that he was hurting across his chest.

I told Dr. Thomas that J. D. had already taken some nitroglycerine. He told me to take him right to the hospital and I did.

Mr. Fain remained in the hospital for fourteen days.

On 15 February 1978, by referral from Dr. Thomas, Mr. Fain saw Dr. O. Brandon Hull, a cardiologist in Lubbock, Texas. Mr. Fain gave Dr. Hull the following history:

Q. What medical history did you obtain?

A. At that time he gave a history of having been hospitalized in December in Clovis, New Mexico and that he was a heavy equipment operator, able to do his yard work, he hunted and hiked in the mountains and tolerated this well.

He began to tire more easily early in the fall of 1977. He noticed this discomfort the first time when he went elk hunting in Chama, at an altitude of around twelve thousand feet. He felt that his work was a strain on his nerves and that when—he is a finish blade operator—and when several people—state inspectors were standing around watching him that this produced increased anxiety.

He first noticed a pressure discomfort in his chest on Sunday, December 4th, while sitting around. This lasted about two minutes, but did radiate into the jaws. He had no problem the next Monday. On Tuesday, he had the same type of discomfort, radiating to his neck, jaws and arm, accompanied by nausea, shortness of breath and sweating. He was taken home and was seen by Dr. Thomas in Clovis. An electrocardiogram was done. He was given nitroglycerine and sent home to rest.

On Thursday, the same discomfort occurred, more severe. He got no relief from the nitroglycerine. He was admitted to the hospital and remained there for fourteen days.

Since then, he had been up and around the house, but he tired easily and had to use nitroglycerine for burning in his chest the day before he was seen in the office, which would be 2–13–78. He had some aching in his left arm that would last maybe for three to four hours and he also had some soreness in the left armpit. Review of systems was otherwise negative.

Dr. Hull gave the following testimony concerning the results of this physical examination of Mr. Fain:

Q. What examination, if any, did you perform at that time?

A. On physical examination, he did not appear acutely or chronically ill. He weighed a hundred and ninety-four pounds.

His positive physical findings for his heart showed no shocks or thrill, normal sinus rhythm, sounds were normal, and he had an occasional premature or ectopic beat, blood pressure was 110/86 in both arms in a sitting position, chest was clear, albumin was negative, extremities normal, and x-rays showed a little left ventricular preponderance. *His electrocardiogram showed a recent anterior myocardial infarction, with the possibility of an aneurysm* (emphasis added).

Dr. Hull further stated that x-rays, electrocardiograms and other laboratory tests were performed on Mr. Fain. Dr. Hull stated the results of these tests as follows:

A. Well, in order to explain these things, I have previously mentioned, I would just say that back to the heart, an ectopic beat just means a beat that comes in out of time. There are numerous types of these.

His electrocardiogram indicated that he had had a recent heart attack, with a possibility of some ballooning or dilation of the wall of the left ventricle, which is the main pumping chamber of the heart,

due to the heart muscle damage he had sustained with his heart attack.

Left ventricular preponderance on x-ray, means that this was a little more prominent than usual and would go along with the possibility of the aneurysm, which was described above.

It was felt that he had had atherosclerotic heart disease, or disease due to the hardening of the arteries of the blood vessels that supply the heart muscle, and that he was continuing to have angina. Angina means heart pain, generally on effort or under emotion or tension.

As to treatment instituted and prescribed, Dr. Hull stated:

Q. After your examination, what treatment, if any, did you institute or prescribe?

A. He was treated with Nitrospan Endoral. It was suggested that he have a coronary angiogram, which means a dye study of the blood vessels that supply the heart muscle. He was scheduled to have this done on February 23rd, 1978.

MR. ACTKINSON: Question No. 40:

Q. What was his progress under this treatment?

A. Well, that question is not worded very good. I think it might be of real benefit to the parties concerned if we change that question from 'progress' to 'findings'.

This angiogram was performed by Dr. Arrington. It showed that he did have arteriorsclerotic or atherosclerotic heart disease, with extensive myocardial infarction, which means an extensive heart attack, with a small ventricular aneurysm or the dilation of the heart muscle wall, which I referred to earlier in a question under x-ray and electrocardiogram. Also, that the proximal anterior descending coronary artery, one of the branches, was occluded eighty percent of the obtuse margin, another branch, on circumflex, and seventy percent occlusion of the main trunk with circumflex, thirty percent of an excentric plaque, or a little build up of the hardening of the arteries material in the wall of the proximal right coronary.

His—he also had coronary cenoangiography with left ventriculography, which simply means the dye in the left ventricle or the main pumping chamber of the heart. It was felt that he was a candidate for surgery, but this has not been done, primarily due to his being overweight and his continued smoking.

Q. What was your preliminary diagnosis?

A. Preliminary diagnosis was the same as I testified earlier on my findings when I first saw him. This was just confirmed by the coronary angiography, the study that was done which I have immediately referred to just before this question.

Dr. Hull also gave the following significant testimony:

Q. What are the symptoms which would be recognizable by a layman for a myocardial infarction?

A. The type of discomfort that Mr. Fain described when he went into the hospital in Clovis, the previous discomfort that he had, such as hunting and so on, these were—this is pretty typical of angina or heart pain. When it becomes more severe, a person can go ahead and actually have heart muscle damage, which Mr. Fain did when he went to the hospital.

MR. ACTKINSON: Question No. 48:

Q. What is the layman's term for myocardial infarction?

A. Heart attack.

Q. Would physical strain, exertion, and/or tension increase the chances of a myocardial infarction?

A. Yes.

Question No. 50:

Q. Now, Dr. Hull, should the jury find that the Plaintiff Janeral D. Fain, was riding and operating heavy equipment while being exposed to very cold weather, and in riding and operating said heavy equipment was having to operate manually a lever with his right arm, do you have any opinion satisfactory to yourself, and based upon reasonable medical certainty as to whether or not said activities by the Plaintiff contributed to the Plaintiff's disability?

A. This is a very difficult question to answer because we know that the patient, or any patient, may have heart pain, such as he had, when he is sitting around doing nothing. Certainly, under the circumstances that are described in this question, it could be aggravating, an aggravating cause, to anyone that had this type of heart problem.

MR. ACTKINSON: Cross Question No. 1:

CROSS QUESTION

Q. Dr. Hull, my name is Bob Craig, and I represent St. Paul Insurance Company in the worker's compensation case. I would first like to ask, Doctor, without knowing the point in time that Mr. Fain was riding and operating his equipment as stated in Direct Question No. 50, in relationship to the point in time of Mr. Fain's heart attack, isn't it true that you would be unable to testify within reasonable medical probability that such activity was a cause of the heart attack?

A. One could not say, positively say, that it was the cause of it, no. Aggravation, yes; positive, no.

Cross Question No. 2:

Q. Also, Doctor, without some description of the extent and nature of the physical activity involved in Mr. Fain's operating and riding of this equipment, as set forth in Direct Question No. 50, isn't it true that you would be unable to testify within reasonable medical probability that such activity was a cause of Mr. Fain's heart attack?

A. As a positive cause, that is correct.

In essence this testimony shows, *inter alia*, that Mr. Fain had "atherosclerotic heart disease or disease due to the hardening of the arteries of the blood vessels that supply the *heart muscle*"; that on 6 December 1977, he had pressure discomfort or chest pains while at work; that a few hours later, he was examined by his family physician; that the family physician told him to

rest at home for two or three days and prescribed nitroglycerine if the chest pains reoccurred; and that on 8 December 1977, while lounging around his home, Mr. Fain sustained a heart attack. Mr. Fain says the case before us is factually similar to *Stoghill v. Texas Employers Insurance Ass'n*, 582 S.W.2d 102 (Tex.1979), and that the decision in *Stodghill* is controlling in this instance. We disagree.

In *Stodghill*, the worker was injured when he fell fifteen feet to the ground from a drilling rig on which he was working. He sustained a fractured right arm at the wrist, an acute lumbosacral strain, and bruise and contusion of the right hip and the right elbow. Forty-seven days later, the worker had a heart attack which resulted in his death. Based upon a favorable jury verdict, the trial court rendered judgment for death benefits under the Workers' Compensation Act. The court of civil appeals reversed the judgment of the trial court and rendered judgment that there was no evidence to support the jury's answer that an accidental fall injuring the worker was a producing cause of his death from a myocardial infarction forty-seven days later. In reversing the judgment of the court of civil appeals, the Texas Supreme Court said, *inter alia*, that:

> The substance of the testimony of Dr. Pasos was that it was probable that the stress of the injuries resulting from Stodghill's fall, when superimposed upon the existing arterial hypertension, was a producing cause of Stodghill's death. This testimony, though strongly rebutted by other testimony and circumstances, constitutes some direct evidence of probative force of the causal connection between the injury and the death. *Lucas v. Hartford Ins. & Indemnity Company, supra; Otis Elevator Company v. Wood, supra.*

*Id.* at 105.

Thus, the Texas Supreme Court determined that some probative evidence existed that the worker's on-the-job injury was a producing cause of his death from a heart attack. In the case before us, the jury found no on-the-job injury. Therefore, we do not have the question as to whether an on-the-job injury produced a subsequent heart attack.

Having reviewed the evidence under the appropriate legal standards, we conclude that Mr. Fain failed to conclusively establish that he sustained a heart injury on 6 December 1977, and that the jury's failure to find that he sustained a heart injury on the day in question is not so against the great weight and preponderance of the evidence as to be manifestly wrong or unjust.

In summary, we overrule Mr. Fain's points of error and contentions. Accordingly, the judgment of the trial court is affirmed.